COPY

ORIGINAL FILED
07 OCT 16 PM 3:46
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  MATTHEW I. KREEGER (CA SBN 153793)
   Email: MKreeger@mofo.com
2  MORRISON & FOERSTER LLP
   425 Market Street
3  San Francisco, California 94105-2482
   Telephone: 415.268.7000
4  Facsimile: 415.268.7522

5  JANA G. GOLD (CA SBN 154246)
   Email: JGold@mofo.com
6  MORRISON & FOERSTER LLP
   755 Page Mill Road
7  Palo Alto, California 94304-1018
   Telephone: 650.813.5600
8  Facsimile: 650.494.0792

9  Attorneys for Plaintiff
   EPITOMICS, INC.
10

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                                    C 07 5275  MMC

14  EPITOMICS, INC.,
                                      Case No.
15              Plaintiff,
                                      COMPLAINT FOR BREACH OF
16       v.                           CONTRACT; TRADE SECRET
                                      MISAPPROPRIATION; BREACH
17  CELL SIGNALING TECHNOLOGY, INC.,  OF THE COVENANT OF GOOD
                                      FAITH AND FAIR DEALING;
18              Defendant.            TORTIOUS INTERFERENCE
                                      WITH PROSPECTIVE
19                                    ECONOMIC ADVANTAGE;
                                      AIDING AND ABETTING
20                                    BREACH OF DUTY

21                                    JURY TRIAL DEMANDED

pa-1197638                            COMPLAINT

## INTRODUCTION

Almost thirty years ago, Nobel prize-winning scientists developed the technique of creating monoclonal antibodies (sometimes called "MAbs") from mice. The remarkable specificity of antibodies – their ability to bind to and attack specific antigens without harming other cells – has long made antibodies promising agents for human therapy. Monoclonal antibodies permit scientists to harness this ability by making it possible to purify and produce specific antibodies in large amounts.

Although the original and now standard method for making monoclonal antibodies uses mice, plaintiff Epitomics, Inc. ("Epitomics") has developed a unique and proprietary method for making monoclonal antibodies from rabbits. Rabbit antibodies offer several advantages over mouse antibodies, including a more diverse and higher affinity and specificity. Epitomics is the exclusive licensee of the patent rights covering the procedure for making rabbit antibodies, and has developed additional proprietary technology and know-how for making such antibodies efficiently. In 2003, Epitomics sublicensed this technology to defendant Cell Signaling Technology, Inc. ("CST").

For several years, CST paid royalties on all of its rabbit monoclonal antibody ("RabMAb") products. In late 2006, however, it came to Epitomics' attention that CST was withholding royalties on a group of "new" RabMAb products that CST claims are not subject to royalties. CST sells such products in direct competition with Epitomics and outside the scope of its license. Ever since CST hired one of Epitomics' key business development managers, this competition has increased to target some of Epitomics' most valuable customers.

Epitomics is not aware of any scientific process for producing RabMAbs that would not infringe on Epitomics' patent rights, but even if there were such a process, CST continues to rely on the proprietary know-how Epitomics conveyed under the parties' agreements. CST is misusing Epitomics' intellectual property rights, increasingly in direct competition with Epitomics.

## THE PARTIES

1.  Plaintiff Epitomics is a Delaware corporation with its principal place of business in Burlingame, California.

2.  Defendant CST is a Massachusetts corporation with its principal place of business in Beverly, Massachusetts.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over this action under 28 U.S.C. §1332 in that the parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4.  Venue is proper in this Court under 28 U.S.C. § 1391 in that CST is subject to jurisdiction in this district and a substantial part of the events and omissions giving rise to the claims in this action occurred in this district.

## BACKGROUND FACTS

5.  In 1995, Dr. Katherine Knight of Loyola University, Chicago, successfully developed a method for making rabbit fusion partners, the fundamental precursor for producing rabbit monoclonal antibodies. Dr. Knight was awarded United States Patent 5,675,063 for her invention ("the Loyola Patent"). A year later, Dr. Robert Pytela at the University of California, San Francisco, developed an improved rabbit cell line (the "Improved Line") on Loyola's behalf.

6.  In February 2002, Loyola licensed the rabbit fusion partner technology, including the Improved Line, to Epitomics with the goal of having the technology developed and commercialized ("the Loyola license"). The Loyola license was revised and restated in October 2006.

7.  Under the Loyola license, Epitomics has developed a unique and proprietary method for making rabbit monoclonal antibodies on a commercial basis. In overview, the process is similar to methods for making mouse monoclonal antibodies. Proprietary fusion partner cells fuse to rabbit B-cells to create Rabbit Hybridoma cells. Hybridoma cells are the key to monoclonal antibody technology: they are created by fusing antibody producing B-cells (which are mortal) with myeloma cells (which are immortal). The Rabbit Hybridoma cells are then

screened to select for clones with specific and sensitive antigen recognition, and are characterized using a variety of methods. Successfully implementing this technology with rabbit cells is very different from the procedures used in commercial development of monoclonal antibodies from mice, however. Epitomics' proprietary know-how includes the development of methods of isolating and processing of B-cells from rabbit spleens; creating fusions; and growing, maintaining, purifying, improving the yield of, and characterizing Rabbit Hybridoma cells. This technology has been developed by Epitomics at substantial expense and is of considerable commercial value.

8. Rabbit monoclonal antibodies have several advantages over those derived from mice. The rabbit immune system generates antibody diversity and optimizes affinity by mechanisms that are more efficient than those of mice and other rodents. In addition, many small compounds and peptides do not elicit a good immune response in mice but do so in rabbits. For both of these reasons, rabbit monoclonal antibodies often offer better antigen recognition. As a result of these advantages, the market for rabbit monoclonal antibodies is growing at a fast pace.

9. Epitomics offers custom services to researchers and developers who want Rabbit Hybridomas developed based on specific antibodies for research, diagnostic or therapeutic purposes. Epitomics also offers many RabMAb "products"; that is, specific antibodies cloned from rabbits rather than mice.

10. CST competes directly with Epitomics. CST also offers antibody "products" (including, but not limited to, RabMAbs) to researchers, as well as custom services to develop antibodies for research, diagnostic or therapeutic uses.

11. On February 20, 2003, Epitomics and CST entered into a Technology License Agreement ("TLA") that would allow CST "to make and commercialize rabbit monoclonal antibodies" using Epitomics' proprietary "Fusion Technology." Fusion Technology was defined to include Epitomics' "improved proprietary rabbit hybridoma fusion partner/cell line (expressly including the best cell line in [Epitomics]' possession as of the Effective Date) useful for the practice of technology within [the Loyola license rights], together with all associated know-how and show-how, including written protocols and formulas for media and solutions required for

growth of the fusion partner, preparation of spleen cells, performance of fusion, subcloning and the final large scale production of resulting hybridomas, and related technical expertise, together with any subsequent improvements to the fusion partner (including new fusion partners), protocols and technology." Epitomics thus agreed to transfer and license its proprietary commercial and process know-how, along with a sublicense to its Loyola Patent rights, to CST. Under the TLA, CST was granted a non-exclusive, non-transferable, worldwide, royalty-bearing license, during the term of the agreement, to possess and use Fusion Technology to manufacture licensed rabbit monoclonal antibody products.

12. CST's rights under the TLA were limited in several significant ways. First, CST's "Field of Use" was limited to sale of Licensed Products to third parties "in the research market and/or diagnostic market"; indeed, "[s]pecifically excluded from the Field of Use [was] the sale of any Licensed Product as a therapeutic product in the therapeutic field." Second, CST was limited in the number of antibodies it could make and sell under the agreements (to 500 "protein targets" not counting the three targets produced under the parties' Service Agreement, and certain other types of antibodies). Third, CST's license to Fusion Technology (that is, the license to use Epitomics' know-how) was limited to five years, although CST has a "perpetual royalty-bearing license" to make, use and sell any Licensed Product produced during the term of the TLA.

13. Finally, in addition to these license limitations, the TLA included an express provision reiterating CST's "Restriction on Use," specifying that CST will use Fusion Technology solely for the production of licensed product at a licensed facility and would not transfer Fusion Technology to any third party or use Fusion Technology for any purposes other than that defined in the TLA. CST further agreed to return all Fusion Technology at the termination of the TLA (or destroy it at Epitomics' request).

14. In addition, CST agreed to grant Epitomics an exclusive, worldwide, perpetual, royalty-bearing license to select, obtain and use DNA material produced under the agreement "for the production and commercialization of antibody products by [Epitomics] in the therapeutic field."

15.  CST also granted Epitomics a non-exclusive, paid-in-full license to any improvements to Fusion Technology discovered or made by CST during the time of the agreement, to use such improvements for Epitomics' non-commercial, internal research purposes only.

16.  In consideration for the rights it was being granted, CST agreed to pay the following fees and royalties: (1) a one-time fee of $500,000, with $400,000 due shortly after execution and another $100,000 due shortly after the commercial release of the first ten licensed products by CST; (2) a $5,000 per target fee for each "Protein Target" against which CST produced a licensed product; and (3) 8% of Net Sales of any licensed product (subject to certain caps and minimums based on whether other royalties were due on the same product). CST also agreed to provide reports supporting its royalty calculations every six months.

17.  The TLA also provides for liquidated damages of $1,000,000 in the event of an uncured breach of CST's use restriction covenants.

18.  Shortly after the license was signed, Epitomics personnel met with CST scientists to transfer the know-how that was licensed under the TLA. A CST scientist was trained at Epitomics' facility for the detailed procedures of Fusion Technology. Epitomics also transferred highly detailed and confidential "SOPs" ("Standard Operating Procedures") to CST during this time as part of the Fusion Technology. The SOPs include detailed and specific instructions regarding the specialized procedures developed by Epitomics for production of Rabbit Hybridomas and monoclonal antibodies. The fusion partner cell 240 E-W was transferred to CST on March 17, 2003 and an improved cell line 240 E-W2 was subsequently sent to CST on September 15, 2005.

19.  In late November and early December 2006, Epitomics became aware of two facts indicating that CST was in breach of the TLA and otherwise misusing intellectual property that had been entrusted or licensed to it. First, on November 28, 2006, the CEO of CST, Dr. Michael Comb, announced to Epitomics' CEO Dr. Guo-Liang Yu that CST had developed its "own" rabbit monoclonal antibodies and that CST intended to use this technology to produce antibodies that it would commercialize. Indeed, since that time, CST has listed at least ten "new" rabbit

antibodies on its website and has not paid royalties on any of them. Upon information and belief, CST used Fusion Technology to develop these "new" antibodies.

20. Around the same time, CST announced an alliance with AstraZeneca, a former customer of Epitomics, to provide rabbit monoclonal technologies for biomarker assays to support AstraZeneca's oncology development programs. Based on the press accounts of that alliance, it appears that CST is providing services rather than products to AstraZeneca. CST has since announced similar relationships with other Epitomics customers, including, but not limited to, Genentech and Roche Pharmaceuticals. Epitomics is informed and believes and theron alleges that CST's ability to target some of Epitomics' best customers is based on CST's hiring and use of one of Epitomics' former business development managers. In addition, Epitomics is informed and believes that CST represents to those customers that it has made improvements in Fusion Technology that make its products and services superior to Epitomics' products and services. It has made these representations despite its obligation to disclose and offer such improvements to Epitomics, an obligation it has not met.

21. In late December 2006, Epitomics (through its counsel) challenged CST to defend this apparent misuse of Fusion Technology and breach of CST's license. In particular, Epitomics asked CST to support its claim of independent development of rabbit monoclonal technology and its claim that its new products do not require a license to the Loyola patent rights. Epitomics also invoked the audit provisions of the TLA. After almost a year of correspondence, CST has failed to provide the requested information, insisting that the information could only be disclosed if Epitomics engages an independent expert to review CST's technology, subject to restrictions on what such an expert could disclose to Epitomics.

22. In September 2007, CST invoked a dispute resolution provision of the TLA requiring a face-to-face meeting between corporate principals before filing suit. A few weeks later, Epitomics offered possible dates for the proposed meeting. On October 10, 2007, CST responded that it considered prior telephone calls between the CEOs to be sufficient effort to resolve Epitomics' concerns regarding CST's activities and reiterated that it would only provide further information if Epitomics engages an independent expert.

23. In sum, having extracted valuable technology and rights from Epitomics, CST has repudiated its agreement to limit its use of that technology and has not only failed to compensate Epitomics, but has used the technology to compete directly with Epitomics. Epitomics brings the following claims.

**FIRST CLAIM FOR RELIEF**
**(Breach of the TLA)**

24. Epitomics realleges and incorporates by reference the allegations in paragraphs 1 through 23 above.

25. The TLA is a valid and enforceable agreement.

26. Epitomics has complied with all material obligations under the TLA.

27. CST has breached the TLA by, among other things, (1) using Epitomics' Fusion Technology to develop products that CST wrongly maintains are not Licensed Products; (2) purporting to sell or license rabbit antibody services or products produced using Epitomics' Fusion Technology beyond the scope of CST's licensed rights; (3) failing to pay royalties on such revenues; and (4) failing to disclose improvements or offer a license to new products developed by CST.

28. Epitomics has been damaged by this conduct in an amount to be determined at trial.

29. Under the provisions of the TLA, Epitomics is entitled to $1,000,000 as liquidated damages for CST's breach of the covenant to limit use of the technology.

**SECOND CLAIM FOR RELIEF**
**(Misappropriation of Trade Secrets)**

30. Epitomics realleges and incorporates by reference the allegations in paragraphs 1 through 29 above.

31. The Fusion Technology transferred to Epitomics under the TLA, including, but not limited to, the SOPs, is commercially valuable technology that derives independent economic value from not being known to others in the field. This information is protected by Epitomics as confidential information through, among other things, nondisclosure agreements and

COMPLAINT
7

pa-1197638

confidentiality agreements and, in fact, constitutes some of the most valuable information of the company.

32. CST was authorized to use Epitomics' Fusion Technology, disclosed pursuant to the TLA, solely for the purposes of making and selling licensed products for research and diagnostic purposes. CST is not authorized to use Fusion Technology for any other purpose.

33. Despite this, on information and belief, CST deliberately and improperly used Fusion Technology beyond the limited scope of the uses it was authorized to make of Fusion Technology.

34. Epitomics is informed and believes that CST intends to continue using the know-how obtained as part of Fusion Technology after February 2008, when the TLA expires.

35. CST's unauthorized use of Fusion Technology is a misappropriation of the information and violates trade secret laws, including California Civil Code section 3426 *et seq*. As a result of these violations, Epitomics has been harmed in an amount to be determined at trial. Additionally, Epitomics has been harmed in non-monetary ways that can be remedied only by injunctive relief.

### THIRD CLAIM FOR RELIEF
### (Breach of the Covenant of Good Faith and Fair Dealing)

36. Epitomics realleges and incorporates by reference paragraphs 1 through 35 above.

37. In every contract, there is an implied promise of good faith and fair dealing that precludes one party from taking actions that frustrate the intent of the contract. The TLA was intended to permit CST to commercialize certain rabbit monoclonal antibody products for research and diagnostic use while preserving Epitomics' rights to exclusivity in the therapeutic area.

38. CST breached the covenant of good faith and fair dealing by, among other things, encroaching on Epitomics' business using Epitomics' technology.

39. As a result of CST's breach, Epitomics has been damaged in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Intentional Interference with Prospective Economic Advantage)

40. Epitomics realleges and incorporates by reference paragraphs 1 through 39 above.

41. Epitomics has had beneficial economic relationships with pharmaceutical and biotechnology companies such as Genentech, AstraZeneca, and Roche Pharmaceuticals, among others.

42. In June 2006, CST hired Helen Cha, Ph.D, a former business development manager who had been employed by Epitomics since December 2003 to develop those relationships. Epitomics is informed and believes that CST learned confidential details regarding these relationships through its employment of Dr. Cha.

43. Epitomics is informed and believes that CST exploited Dr. Cha's knowledge of these business relationships and goodwill developed on Epitomics' behalf to divert these customers to CST. Epitomics is further informed and believes that CST misrepresented and encouraged Dr. Cha to misrepresent certain claimed advantages in its products in order to undermine Epitomics' products. As a result, Epitomics' relationships with some of its most valuable service customers have been disrupted.

44. Epitomics has been damaged by this conduct in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Duty)

45. Epitomics realleges and incorporates by reference paragraphs 1 through 44 above.

46. Dr. Cha had both contractual and fiduciary obligations arising from her employment with Epitomics. Those contractual and fiduciary relationships arose from Epitomics' entrustment of confidential information regarding its business relationships and goodwill to Dr. Cha.

47. Epitomics is informed and believes that CST provided Dr. Cha with substantial assistance and encouragement in breaching her duties to Epitomics by exploiting the confidential

information and goodwill she acquired on Epitomics' behalf in service to CST and to Epitomics' detriment.

48. Epitomics has been harmed by this conduct in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Epitomics prays for judgment as follows:

1. For actual and special damages, in an amount to be determined at trial;

2. For liquidated damages in the amount of $1,000,000;

3. For an order of restitution of all monies constituting CST's unjust enrichment;

4. For punitive damages in an amount to be determined at trial;

5. For specific performance of CST's reporting and accounting obligations under the TLA;

6. For specific performance of CST's disclosure and licensing obligations under the TLA;

7. For temporary, preliminary and permanent injunctive relief prohibiting CST's disclosure or use of Epitomics' trade secrets, including, but not limited to, sale of products incorporating the Fusion Technology which are beyond the scope of the TLA;

8. For prejudgment interest on any monetary recovery;

9. For attorneys fees and costs; and

10. For such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Epitomics hereby demands a trial by jury of any and all issues triable by a jury.

Dated: October 16, 2007

MATTHEW I. KREEGER
JANA G. GOLD
MORRISON & FOERSTER LLP

By: /s/ Matthew I. Kreeger

Attorneys for Plaintiff
EPITOMICS, INC.